IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| JAMES FREEMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:19-cv-1502 (LMB/MSN) |
| | ) |
| SCIENCE APPLICATIONS | ) |
| INTERNATIONAL CORPORATION, | ) |
| | ) |
| Defendant. | |

MEMORANDUM OPINION

Before the Court are the defendant, Science Application's International Corporation's ("SAIC" or "defendant") Motion for Summary Judgment, [Dkt. No. 43], and plaintiff James Freeman's ("Freeman" or "plaintiff") Rule 56 Motion for Summary Judgment as to Counts I and III. [Dkt. No. 44]. The Court has heard oral argument and taken the motions under advisement. For the reasons discussed below, plaintiff's motion will be denied, defendant's motion will be granted, and this civil action will be dismissed.

## I. BACKGROUND

### A. Factual Background

According to the allegations in his First Amended Complaint, Freeman was hired by SAIC for the first time in 2011, and worked as a Manager of Business Development until 2012, when he left the company. [Dkt. No. 21] at ¶¶ 9, 11. On July 30, 2018, Freeman began working for Engility Holdings ("Engility"),[1] a company that serviced a number of defense and

---

[1] In his First Amended Complaint, Freeman alleges that he was hired by SAIC on July 30, 2018, [Dkt. No. 21] at ¶ 12; the summary judgment papers show that this allegation was inaccurate. He was first hired by Engility, which was then acquired by SAIC.

intelligence-related government contracts, again in a business development role. [Dkt. No. 21] at ¶ 12; [Dkt. No. 46-2] at 4. On September 10, 2018, SAIC acquired Engility, although the merger was not successfully completed until January 14, 2019. [Dkt. No. 45] at 8. On October 27, 2018, Freeman left his business development role, taking a pay cut to move into the role of Strategic Communications Advisor supporting one of SAIC's contracts in the intelligence community. [Dkt. No. 46-2] at 4; [Dkt. No. 45-10] at 265:11-13. This contract was known as the "Echo Contract."[2] The Program Manager for the Echo Contract was Stefanie Wall ("Wall"); Freeman reported to Wall as his direct supervisor on the project.

Freeman alleges[3] that during the first week of his assignment to the Echo Contract, Wall engaged in inappropriately sexual conduct by staring at his groin during a meeting in her office and putting her hand on his shoulder and sighing. [Dkt. No. 21] at ¶¶ 21-22. On another occasion during the first week of his new position, he remembers leaving the office at the same time as Wall, and claims that when she saw him push against the security turnstile to leave, she grabbed his arm and commented on how his bicep looked. [Dkt. No. 46-3] at 164-165:22-15. He further alleges another incident, this time in the office kitchenette, when Wall came in while he was facing the other direction and "playfully" touched his lower back. Id. at 161:1-20. Freeman also claims that Wall once leaned over him and rubbed his earlobe for a second or two while they were reviewing film related to the Echo Contract. Id. at 154-55. Finally, Freeman testified that when he grew out his beard, Wall commented that he looked good (like an actor whose name Freeman could not remember). Id. at 166:10-21. Freeman did not identify other instances of

---

[2] The identity of the government client involved in the Echo Contract has not been disclosed because of its intelligence implications.

[3] SAIC denies these allegations, which came from either the First Amended Complaint or Freeman's deposition, but for the purposes of summary judgment argues that even accepting them as true, they do not establish a hostile work environment. [Dkt. No. 45] at 23.

2

harassment with specificity, but testified that in general Wall touched him inappropriately "somewhere in the order of two to three times a day." Id. at 160:6-8.

On November 14, 2018, both Freeman and Wall traveled separately to New York City to attend different events. [Dkt. No. 21] at ¶¶ 24-25. Freeman emailed his office the day before, on November 13, to let staff know that he would be going to New York, and Wall responded that he should have fun and could swing by her event's cocktail hour to say hi. [Dkt. No. 46-6]. The parties agree that Wall met Freeman and Freeman's friends at a bar after both events were over. Freeman testified that Wall "asked if she could crash the party"—meaning the after-party where Freeman was drinking with his friends, [Dkt. No. 45-10] at 175:7-10; however, the text messages in the record show it was really Freeman who first texted Wall "Meet us there" at 9:50 PM, and she only later confirmed that it was "ok if [she] crash[ed]" at 10:27 PM. [Dkt. 46-8] at 9-11. After joining Freeman, Wall spoke mainly to one of his acquaintances. [Dkt. No. 45-10] at 175:21-176:4. Freeman testified that Wall "end[ed] up basically inviting herself out for the entire evening," [Dkt. No. 45-10] at 175:19-20, although the record shows that she joined his party for less than two hours and then went back to her hotel alone. [Dkt. 46-8] at 11.

At 1:02AM, Freeman texted Wall to ask whether she "made it back to the hotel okay," responding to her earlier message that her cab driver had fallen asleep while driving. Id. at 12. She responded with a selfie, showing her face without makeup and her shoulders in a tank top, that was captioned "All washed up! No more glam :/" Id. at 13. A minute later, she asked Freeman if he was "on [his] way to catch the train." He replied that he was out. She asked whether he was still at a bar called Dead Rabbit, and when he said they had gone to a different bar, she responded, "Pretty cool!" Id. There is no evidence in the record of any other text message between them until late December.

3

According to Freeman, three days after the New York trip, he decided to make clear to Wall that he was in a committed relationship. [Dkt. No. 45-10] at 182-83:20-3. Freeman testified that during this "water cooler" encounter for which there were witnesses, Wall acted "shocked" that he had a girlfriend and asked him how long he had been in a relationship and to see a picture of his girlfriend. Id. at 199: 11-21. After that conversation, all inappropriate touching and comments about Freeman's appearance abruptly stopped, and instead Wall became "short, punchy, negative, [and] rude" toward him. Id. at 201:7-12.

The parties agree that throughout Freeman's work on the Echo Contract, there had been problems with the way that employees were filling out their timecards and badging in and out of the Sensitive Compartmented Information Facility ("SCIF"). [Dkt. No. 45] at ¶ 10; [Dkt. No. 46] at ¶ 25. On December 18, 2018, Wall had a conversation with Freeman to counsel him about his failure to follow proper timecard and badging procedures; that conversation is memorialized in a December 20, 2018 email. [Dkt. No. 45-5] at 3. That email instructs Freeman that he needed to record his time accurately and assign it to the right day, and that he must badge in and out of the SCIF whenever he entered or left it. [Dkt. No. 45-5]. In that email, Wall also referenced a possible move by Freeman back to other organizations that had a business development focus, explaining: "My goal is to help you be successful in any role you take. Keep me posted on how your conversation with Stacey goes about returning to the BD organization. If you need help with making other connections or looking at other opportunities let me know." Id.

On January 10, 2019, Wall received an email from David Nemer, who was a Team Leader on the Echo Contract. [Dkt. No. 49-5] at ¶¶ 2-4. Nemer reported concerns with Freeman's recent conduct toward the government customer, specifically that Freeman was networking too aggressively, "pushing relationships that may be frowned upon with the

4

customer." [Dkt. No. 45-4] at 1-2. Nemer relayed a comment from another team member identified only as Jessy, who stated that she was "creeped out" by Freeman's networking activities.[4] Nemer questioned why Freeman was not completing necessary work back at the office rather than scheduling meetings with the client, reported that he had heard that Freeman would be moving off of the contract in the future, and advised that if that was the case it would be best to "pull him back from customer engagement and cut his ties sooner than later." Id. Jessy responded to Nemer's email to reiterate concerns to Wall, saying that Freeman's "interactions with people here have definitely been uncomfortable" and "may have reflected poorly on us as a team." Id.

On January 18, 2019, Wall told Freeman that he would be removed from the contract. She did not discuss the contents of either Nemer's or Jessy's emails with Freeman; nor did she renew her earlier concerns about his timecard and badge issues. Instead, Wall falsely told Freeman that he would be removed from the Echo Contract because of funding issues with the contract. Immediately after his conversation with Wall, Freeman went to speak to Stacey Page ("Page"), SAIC's Vice President of Operations. Freeman gave Page what he described as a "30,000 foot overview" of how he was being "railroaded" off the contract, [Dkt. No. 45-10] at 209:8-14. It is undisputed that during that brief January 18, 2019 conversation, he did not tell Page that he had experienced sexual harassment. [Dkt. No. 49-19] at 73-74.

On January 25, 2019, the Senior Subcontract Administrator for Booz Allen Hamilton, Isaiah Nicholson, sent an email to the Echo Contract management team, including Wall. [Dkt. No. 45-6]. In that email, Nicholson "formally inform[ed] SAIC (Engility) that James Freeman's personal conduct on site has been less than ideal," stated that Freeman's conduct was "not in line

---

[4] Neither Nemer nor Jessy was deposed.

with Booz Allen standards," and requested that Freeman be removed from the Echo Contract no later than January 31, 2019. Id. According to the investigation later conducted by SAIC Human Resources ("HR") representative Keisha Morris in February and March of 2019, [Dkt. No. 45-9], Nicholson's email was sent at the request of Echo Contract's management team, rather than on Booz Allen's own initiative, id. at 4-5, and Wall has admitted that she asked Nicholson to send the email because of complaints she had received from the government customer. Id. The email from Nicholson did not reference the funding issues that Wall cited in her conversation with Freeman when he was first told he would be removed from the contract.

On January 30, 2019, Freeman had a longer meeting with Page, in which he was given an opportunity to explain his complaints about Wall's management in more detail. According to Freeman, he prepared a timeline of events to bring with him to the meeting, and he read the timeline verbatim to Page. [Dkt. No. 45-10] at 212:7-8, 17-19 ("And I just said, Stacy, I'm just going to read this to you verbatim, and I read it to her verbatim."). The timeline that Freeman read to Page discussed various expectations that he had about what his role on the Echo Contract would be. [Dkt. No. 46-5] at 3. Freeman also described his encounter with Wall in New York City:

> I went for the evening and as it happens Stefanie was in NYC for a veterans charity event that happened to be just a few blocks away from where we were so I invited her to come swing by for drinks with this team (good networking) when her event was over. We did not really talk much while she came and hung out and at the end of the evening after she left she sent me an odd text with a questionable photo. I got on the train very late and came home. Did not really respond.

Id. Freeman went on to explain that he thought Wall treated him differently after the New York trip and after she learned that he had a girlfriend. He wrote:

> This could all be the perfect storm of coincidences and if so that is fine. But if it is something else with my performance I would like to know so that I can grow and be better. If it is not that then my mind is left to wonder and the only plausible

6

> explanation is that everything changed from the moment that Stefanie sent me that photo and I followed up by letting her know about my girlfriend. Hence her demeanor toward me changed drastically after I mentioned that. she [sic] used to be friendly and supportive and helpful and communicative, and then all that went away.

Although Freeman stated that the situation made him "very uncomfortable," he did not include any allegation that Wall ever touched him, stared at his groin, or sexually harassed him other than sending the "questionable photo" and changing her tone after he revealed that he had a girlfriend. Id. at 1-3. Page told Freeman she would refer the matter to HR, but the basis for her referral was that an employee was "feeling unfairly treated," not that he was being sexually harassed. [Dkt. No. 49-19] at 54:15-18.

It is not clear whether SAIC began to investigate Freeman's complaint before February 11, 2019, when Freeman (who was on paid leave at the time) again emailed Page and reiterated his concerns about being removed from the Echo Contract. [Dkt. No. 46-21] at 1. Page forwarded that email to Morris, who then reached out to Freeman on February 12, 2019. Id. This February 12, 2019 interview with Morris is the first instance in the record of Freeman alleging that Wall had touched him and looked at him inappropriately. Id. at 1-2. In response, Morris interviewed several potential witnesses, none of whom said that they knew of any sexual harassment by Wall, and none of whom recalled Freeman previously relaying to them his allegations about Wall's conduct. Id. at 2-6. Among these witnesses was Faye Hayden, one of Freeman's co-workers. When interviewed, Hayden said that she did not remember hearing any conversation that she would call inappropriate and that she had never seen Wall touch Freeman. Hayden was the only witness whose name Freeman provided to Morris as potential corroboration for his allegations. Id. at 5-6. At the conclusion of the interviews, Morris's HR Report recommended that Wall should be verbally disciplined for her failure to make the basis for

7

Freeman's removal clear, but also stated that Morris could not confirm Freeman's allegations about Wall sexually harassing him. Id. at 6.

Freeman was placed on two-weeks paid leave at the end of January 2019, although he was not given a removal letter until his last day of paid leave so as to maximize his ability to look for positions on another SAIC contract before he was terminated. [Dkt. No. 46-21] at 1. Freeman did not find another internal position and was removed from the contract after his paid leave time expired.

### B. Procedural History

On May 21, 2019, Plaintiff filed a Charge of Discrimination with the EEOC, alleging sexual harassment, hostile work environment, and retaliation. On August 28, 2019, the EEOC issued a Right to Sue letter. Plaintiff timely filed his first complaint on November 26, 2019, and filed the Amended Complaint on February 11, 2020. [Dkt. No. 21]. The three-count Amended Complaint respectively alleges unlawful termination, hostile work environment, and retaliation under Title VII, and seeks "injunctive relief to protect others from SAIC's discriminatory and retaliatory actions," as well as punitive damages, back pay, compensatory damages, and fees and costs.

## II. DISCUSSION

### A. Standard of Review

In the Fourth Circuit, summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Norfolk S. Ry. Co. v. City of Alexandria, 608 F.3d 150, 156 (4th Cir. 2010) (quoting Fed. R. Civ. P. 56). A genuine dispute about a material fact exists if "after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012). All inferences must be made in

favor of the nonmoving party. Hawkins v. McMillan, 670 F. App'x 167, 168 (4th Cir. 2016); however, if the moving party's evidence is "merely colorable" or "not significantly probative," then summary judgment may be granted against him or her. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). Where there are cross-motions for summary judgment, a court "consider[s] and rule[s] upon each party's motion separately to determine whether summary judgment is appropriate as to each." Monumental Paving & Excavating, Inc. v. Penn. Mfrs. Ass'n Ins. Co., 176 F.3d 794, 797 (4th Cir. 1999).

### B. Unlawful Termination

To show unlawful termination under Title VII, a plaintiff must show "that (1) he is a member of a protected class; (2) he suffered [an] adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007). Defendant argues that plaintiff has failed to establish his prima facie case in two ways: "First, he cannot show that his job performance was satisfactory. Second, he cannot show that similarly situated employees outside his protected class received more favorable treatment." [Dkt. No. 45] at 19. Both of defendant's arguments are fully supported by the evidence. Other than plaintiff's personal view of his job performance, he has not offered any evidence that he was performing his work satisfactorily, and he has offered nothing but speculative evidence that his position was filled by someone outside of his protected class.

Whether or not plaintiff was meeting his "employer's legitimate expectations" at the time that he was removed from the Echo Contract must be determined from the perspective of the decision-makers, not based on the "self-assessment of the plaintiff." Arthur v. Pet Dairy, 593 F. App'x 211, 217 (4th Cir. 2015) (quoting Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir.

9

2000)). Accordingly, determining whether plaintiff has established a prima facie case requires "consider[ing] the employer's 'evidence that the employee was not meeting those expectations.'" Id. (quoting Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 515 (4th Cir. 2006)). Defendant's evidence that its legitimate expectations were not being met includes Wall's email documenting problems with plaintiff's timecard entries and badging practices, for which he was counseled, [Dkt. No. 45-5], and which he does not dispute. [Dkt. No. 46-5]. Plaintiff seeks to undermine that evidence by arguing that other employees also failed to follow timecard and badging procedure, [Dkt. No. 46] at ¶ 25], and that he cannot possibly have committed timecard "fraud" because had he done so, it would be reflected in his employment file. [Dkt. No. 46] at 16-17. The first of these arguments fails because plaintiff actually admits that he did not follow proper procedure, and he has failed to produce any evidence that he was singled out because of his protected status (in other words, there is no evidence that only men were disciplined for timecard issues while women were not). The second argument also fails because the lack of a formal citation for fraud is not evidence that defendant complied with his employer's timecard policies. The Fourth Circuit has previously found that the absence of formal disciplinary actions cannot establish a prima facie case that an employee was meeting expectations, where there is unchallenged evidence of less formal discipline. Arthur, 593 F. App'x at 217-218 ("Although Appellee did not formally discipline Appellant in writing, this carries little weight because Appellant admitted he was informally counselled about his performance on several occasions over several years."). In the absence of evidence of plaintiff's satisfactory performance, the prima facie case for discriminatory firing cannot be met.

Of much more significance than plaintiff's unsupported assertions about his own performance is the email chain from David Nemer, a Team Leader on the Echo Contract, that

10

was sent to Wall on January 10, 2019 (eight days before plaintiff was told he would be removed from the contract). In that email chain, Nemer complained about plaintiff's "wholly inappropriate" behavior. [Dkt. No. 45-4]. That email was followed by an email from another person working on the contract, agreeing that plaintiff's actions "reflect poorly on us as a team." Id. Plaintiff has not identified any performance evaluations, documents, or statements from anyone at SAIC or Engility contradicting that email chain, or reflecting that his performance on the Echo Contract was satisfactory.

Plaintiff has also failed to produce evidence that his position "remained open or was filled by similarly qualified applicants outside the protected class." Holland, 487 F.3d at 214. Plaintiff argues that this element is met because Wall assumed plaintiff's duties after he was removed from the contract. [Dkt. No. 46] at 17. To support this assertion, plaintiff cites to his own statement of undisputed facts, but that only surmises that "Stefanie Wall very well may have assumed [plaintiff's] job duties after his separation." [Dkt. No. 46] at ¶ 56(a) (emphasis added). Plaintiff attempts to support this claim with HR representative Keisha Morris's deposition; however, Morris explicitly stated: "I don't know who would have assumed [plaintiff's] duties." [Dkt. No. 46-22] at 37:11-12. It was only after that answer when defense counsel asked whether "[i]t is fair to say it would have been someone on his team or Ms. Wall herself" that Morris responded that it "very well could have been Ms. Wall herself." Id. at 37:13-18.

At the summary judgment phase, such "mere speculation" is not sufficient to make out this element of a prima facie claim of discrimination. See Penley v. McDowell Cty. Bd. of Educ., 876 F.3d 646, 650 (4th Cir. 2017) (affirming summary judgment on a First Amendment retaliation claim lacking sufficient evidence to make out a prima facie case). Plaintiff's speculative evidence is particularly unpersuasive in light of evidence offered by defendant that

11

plaintiff's duties were in fact assumed by another man, David Nemer, who states in a declaration that plaintiff's position mostly involved tasks that had been assigned to Nemer before plaintiff started work on the contract, and were re-assumed by Nemer after plaintiff left. [Dkt. No. 49-5] at ¶¶ 4, 11.

Because plaintiff has not produced evidence sufficient to make out a prima facie case of unlawful termination, defendant's motion for summary judgment on Count I will be granted, and plaintiff's motion denied.

### C. Hostile Work Environment

To prevail on his hostile work environment claim under Title VII, plaintiff must prove that he was subjected to offensive conduct which was 1) unwelcome; 2) based on his sex; 3) sufficiently severe or pervasive as to alter the conditions of employment and create an abusive work environment; and 4) imputable to the plaintiff's employer. Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003).

"Mere assertions by the plaintiffs are not enough to survive summary judgment." Abcor Corp. v. AM Int'l, Inc., 916 F.2d 924, 929 (4th Cir. 1990); see also Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) (finding that the trial court did not err in striking portions of plaintiff's affidavit when ruling on summary judgment because courts "generally consider self-serving opinions without objective corroboration not significantly probative"). Plaintiff has not provided any evidence that corroborates his own self-serving testimony about sexual harassment by Wall between October and November of 2018. Recognizing that sexual harassment is often carried out without witnesses present, plaintiff actually claimed that there were witnesses for multiple incidents of harassment. For example, plaintiff alleged in his First Amended Complaint that coworkers were surprised by Wall's reaction to plaintiff's revelation about having a girlfriend, and testified in his deposition that "we were all standing around the

12

proverbial watercooler" when Wall reacted negatively and dramatically to the news, [Dkt. No. 21] at ¶¶ 54-57, [Dkt. No. 46-3] at 199:13-15; however, there are no declarations in the record or depositions from any coworkers who corroborate that allegation or any other claim about Wall treating plaintiff inappropriately. There is also no evidence in the record from any of plaintiff's friends with whom he and Wall met in New York to corroborate the allegations that she was showing unusual attention to plaintiff. [Dkt. No. 21] at ¶¶ 29-31. Plaintiff told SAIC HR representative Morris that Faye Hayden could corroborate his claims, but Hayden told Morris that she did not recall any inappropriate conversations and had never seen Wall touch plaintiff. [Dkt. No. 46-21] at 5-6. Plaintiff also did not raise his allegations of sexual harassment in either of the first two meetings in which he complained to Walls's superior Stacey Page, and the chronology of his concerns which he presented to Page makes no reference to sexual harassment other than an "odd text" and "questionable photo" in New York City. [Dkt. No. 46-5]. The absence of "objective corroboration"—of any kind—of plaintiff's self-serving testimony makes it unlikely that plaintiff has raised a material issue of fact. Evans, 80 F.3d at 962.

Even if the Court were to accept plaintiff's uncorroborated deposition testimony, his claims do not amount to the level of "severe and pervasive" harassment that the Fourth Circuit requires. "[T]he standard for establishing that offending behavior constituted sexual harassment is rather high." Singleton v. Dep't of Corr. Educ., 115 F. App'x 119, 122 (4th Cir. 2004). In Singleton, the Fourth Circuit affirmed a finding on summary judgment that the plaintiff's workplace was not hostile, even though her supervisor "made offensive comments, showed [the plaintiff] unwanted attention that made her uncomfortable, and continuously expressed a sexual interest in her." Id. Similarly, in Byers v. HSBC Finance Corp., another court in this district granted summary judgment for the defendant where the male plaintiff alleged that his female

13

supervisor asked him if he had a girlfriend, invited him to socialize outside of work, and "engag[ed] in physical contacts such as hugging [the plaintiff] and giving him a neck massage." 416 F. Supp. 2d 424, 428 (E.D. Va. 2006). Plaintiff alleges that Wall touched his shoulder and bicep, placed her hand on the small of his back, once briefly rubbed his earlobe, and made a few positive remarks about his appearance. Like the plaintiffs in Singleton and Byers, plaintiff's allegations in this matter certainly describe behavior that may be inappropriate or unprofessional; however, the Supreme Court has been clear that courts are not to "mistake ordinary socializing in the workplace—such as ... intersexual flirtation—for discriminatory 'conditions of employment.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998).

The interactions between Wall and plaintiff in New York City do not save plaintiff's case. For an employer to be liable under Title VII, an employee's subjective perception that a supervisor's conduct is out of line is not enough: "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). Applying Harris's admonition, plaintiff's prima facie case is not met just because he testified that "in [his] opinion" Wall's text messages were "trying to have [him] come back to her hotel room," or because he personally found the photo of her in a tank top "scantily clad and sexually subjective [sic] in the extreme." [Dkt. No. 46-3] at 196:5-6, 198:7-9. It would be difficult for an objective observer to draw the same conclusion as plaintiff: the messages clearly show that it was plaintiff who invited Wall to the bar, that she stayed less than two hours, and that she left alone around midnight. [Dkt. No. 45-8]. Moreover, in describing the New York interaction to Page in the timeline that he prepared for her, plaintiff wrote that he and Wall "did not really talk much while she came and hung out." [Dkt. No. 46-5] at 3. The

timeline does not state or even suggest that Wall asked plaintiff to come back to her hotel, and the photo of Wall shows nothing below her shoulders. Even making every inference in plaintiff's favor, Wall's text messages could not be construed as more than "flirtatious," Oncale, 523 U.S. at 81, and it is hard to conjure a reasonable fact-finder who would consider anything obscene or abusive in either the text messages exchanged in New York, Wall's conduct, or the photo that she sent.

Plaintiff has not supported his allegations of sexual harassment with any corroborating evidence other than his own post-dispute testimony, and the conduct to which he testified is not severe or pervasive enough to be actionable under Title VII. As a result, summary judgment in defendant's favor is appropriate on Count II of the Amended Complaint.

### D. Retaliation

To establish a prima facie case of retaliation, a plaintiff must show 1) that he engaged in a protected activity, 2) that his employer took an adverse action against him, and 3) that there was a causal relationship between the protected activity and the adverse employment action. Foster v. Univ. of Maryland-Eastern Shore, 787 F.3d 243, 250 (4th Cir. 2015). Protected activity under Title VII includes "oppos[ing] any practice made an unlawful employment practice by" the statute. 42 U.S.C. § 2000e-3(a). If a plaintiff establishes a prima facie case, the burden shifts to the defendant to show a "legitimate, non-discriminatory reason for the adverse employment action." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 217 (4th Cir. 2016). If a defendant produces a non-discriminatory reason for termination, the burden shifts back to the plaintiff to show that "this reason was a pretext to disguise the true retaliatory reason" behind his termination. Id. At summary judgment, the plaintiff need not definitively rebut a defendant's proffered legitimate reason for termination, but need only "demonstrat[e] a genuine dispute of

material fact on the question of pretext sufficient to make [the defendant's] proffered justification a triable issue." Id.

"Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). An employer cannot have knowledge that a plaintiff engaged in protected activity before the plaintiff has engaged in the activity, and defendant argues that plaintiff did not engage in any protected activity until after he was already told that he was being removed from the Echo Contract. [Dkt. No. 45] at 29. The evidence in the record aligns with defendant's timeline. According to plaintiff's deposition testimony, the first time that he raised any kind of complaint about Wall was on January 18, 2019, after he was already told he would be removed from the Echo Contract. He testified:

> I got a call from [Wall], I think it was the 17th or the 18th of January. ... I got a call from her saying, Hey, I just had a meeting with the prime. Looks like we have a pricing issue. I want to give you the heads-up that we're gonna have to move you off this contract now ... So when I hung up the phone, I walked downstairs and I went and I tapped on Stacey Page's door and I said, Stacey, I got to tell you something, something I should have told you this a long time ago but this is what's going on.

[Dkt. No. 45-10] at 208:7-19, 209: 3-7. The evidence does not support a conclusion that his January 18 conversation with Page was a protected activity under Title VII, because plaintiff did not tell Page that he believed he had been discriminated against or harassed. Instead, he gave her a "quick ... 30,000 foot overview of [his] take" that he was "being railroaded right out" of the contract. [Dkt. No. 50-19] at 209:8-14. See Bonds v. Leavitt, 629 F.3d 369, 384 (4th Cir. 2011) (stating that "Title VII is not a general bad acts statute" and does not protect employee complaints for behavior outside the scope of the statute's prohibitions).

16

The next time plaintiff complained about Wall was during his second conversation with Page on January 30, twelve days after plaintiff was first told he would be removed from the Echo Contract. Again, there is no evidence in the record that the January 30 conversation with Page amounted to protected activity under Title VII, because nothing in plaintiff's timeline of his grievances, which he read to Page verbatim, discusses sexual harassment or a hostile work environment based on sex discrimination. [Dkt. No. 45-10] at 212:7-8, 17-19. Although plaintiff made the written timeline specifically to document his complaints about Wall, it fails to allege a single instance of sexual harassment. When plaintiff described his New York encounter with Wall, he admitted that he was the one who invited Wall out, and not the other way around. [Dkt. No. 46-5] at 3. He also conceded that he and Wall "did not really talk much while she came and hung out." Id. The only instance of possibly inappropriate conduct described in the timeline was that, after Wall left for the evening, she sent plaintiff "an odd text with a questionable photo," and her "demeanor toward [plaintiff] changed drastically" after she found out plaintiff had a girlfriend. The timeline does not mention any of the allegations that plaintiff makes in his complaint that Wall touched him, stared at his groin, or made comments about his physical appearance. In fact, those allegations do not appear in the record until plaintiff's February 12 conversation with HR, well after plaintiff was already notified that February 15 would be his last day working for defendant. [Dkt. No. 46-21] at 1-2; [Dkt. No. 46-5] at 1. Alleging only that a supervisor sent an "odd text with a questionable photo" and became less supportive after learning that plaintiff had a girlfriend is not enough to put defendant on notice that plaintiff was alleging Title VII discrimination. As Page has testified, she referred the matter to HR after plaintiff read her his timeline on the basis that an employee was "feeling unfairly treated," and not because

17

there was evidence of sexual harassment or discrimination. [Dkt. No. 49-19] at 54:15-18. General unfairness is not unlawful under Title VII.

Even if—contrary to the evidence in the record—plaintiff had brought up his allegations of discrimination in his January 18 "30,000 foot overview" to Page, his retaliation claim would still fail, because the decision to remove plaintiff from the Echo Contract was already being processed. As the Supreme Court has stated, "[e]mployers need not suspend previously planned transfers upon discovering that" protected activity has occurred, and employers "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001). Plaintiff's deposition establishes that he was told he would be removed from the contract before he made any complaint about his situation to his supervisors. [Dkt. No. 45-10] at 208:7-19, 209: 3-7. Clark County makes clear that even if the Court accepts plaintiff's characterization in his Opposition Brief that the actionable adverse employment action occurred on January 25 when Booz Allen's representatives emailed asking to have plaintiff removed, [Dkt. No. 50] at 26-27, that email was merely the culmination of defendant's "previously contemplated" plan to remove plaintiff from the contract.[5] Accordingly, with all inferences made in favor of plaintiff's version of events, he still fails to state a prima facie case of retaliation.

---

[5] Plaintiff argues that defendant's claim that it was already in the process of removing him from the contract before he made any complaints is false, as evidenced by the "shifting reasons" given for his termination. [Dkt. No. 50] at 27-28. His argument is that Wall lacks credibility because she first told him he would be removed because of funding issues with the contract, and then later told Booz Allen to ask for his removal because of his inappropriate conduct; if Wall is not credible, according to plaintiff, then defendant's reasons for removing him must be pretextual. Id. That conclusion does not follow from his premise. Even though Wall's credibility on the subject of plaintiff's removal may be subject to question, the strongest evidence against retaliation by defendant is the email chain from David Nemer, the chronology of plaintiff's complaints to Page, and the contradictions within, and lack of corroboration for, plaintiff's version of events.

### III. CONCLUSION

For the reasons stated above, other than plaintiff's view of the facts, there is insufficient evidence in this record to create any material dispute of fact. Given this evidence, no rational jury could find in plaintiff's favor. Accordingly, defendant's Motion for Summary Judgment [Dkt. No. 43] will be granted; plaintiff's Rule 56 Motion for Summary Judgment as to Counts I and III [Dkt. No. 44] will be denied; and judgment under Fed. R. Civ. P. 58 will be entered in favor of defendant by an Order to be issued with this Memorandum Opinion.

Entered this 24 day of November, 2020.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge